UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 25 C 7461 ) |
| TRIALCO ALUMINUM, LLC, | ) ) ) |
| Defendant. | ) |

## COMPLAINT

The United States of America, by its attorney, Andrew Boutros, United States Attorney for the Northern District of Illinois, and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

### NATURE OF ACTION

1. This is a civil action brought against Trialco Aluminum, LLC pursuant to Section 113(b) of the Clean Air Act ("the Act"), 42 U.S.C. § 7413(b).

2. Defendant has been, and continues to be, in violation of Section 112 of the Act, 42 U.S.C. § 7412, and the National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Secondary Aluminum Production, codified at 40 C.F.R. Part 63, Subpart RRR, at its facility located in Chicago Heights, Illinois.

3. The United States seeks injunctive relief and the assessment of civil penalties to address defendant's past and ongoing violations.

### JURISDICTION, VENUE, AND NOTICE

4. This court has jurisdiction over the subject matter and over the parties pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and

1355(a).

5. Venue lies in this district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and 1395(a) because alleged violations occurred within this district at defendant's facility located in Chicago Heights, Illinois.

6. Notice of the commencement of this action has been given to the State of Illinois, as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## THE DEFENDANT

7. Trialco Aluminum, LLC, an Illinois company with headquarters in Chicago Heights, Illinois, is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e).

8. At times relevant to this complaint, Trialco has owned and/or operated a secondary aluminum processing facility located at 900 East Lincoln Highway, Chicago Heights, Illinois.

## STATUTORY AND REGULATORY BACKGROUND

### Clean Air Act

9. The Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

### NESHAPs

10. Congress has established a list of hazardous air pollutants ("HAPs"), which includes, among others, dioxins and furans ("D/F") and hydrogen chloride ("HCl"). 42 U.S.C. § 7412(b)(1). Pursuant to Section 112(b)(2) of the Act, 42 U.S.C. § 7412(b)(2), EPA periodically reviews the list of hazardous air pollutants and, where appropriate, revises the list by rule.

11. Section 112(c) of the Act, 42 U.S.C. § 7412(c), requires the U.S. EPA Administrator to publish a list of all categories and subcategories of major sources and certain area

sources of the hazardous air pollutants listed pursuant to 42 U.S.C. § 7412(b).

12. Section 112(d) of the Act, 42 U.S.C. § 7412(d), requires the EPA Administrator to promulgate regulations establishing emission standards for each category and subcategory of major source sand area sources of HAPs. These emission standards are called the National Emission Standards for Hazardous Air Pollutants ("NESHAPs"). The NESHAPs apply to specific categories of stationary sources that emit or have the potential to emit one or more hazardous air pollutants listed in 40 C.F.R. Part 63 pursuant to Section 112(b) of the Act. 40 C.F.R. § 63.1(a)(2). Numerous "source categories" are regulated under the NESHAPs, including, for example, coke oven batteries (40 C.F.R. Part 63, Subpart L), dry cleaning operations (40 C.F.R. Part 63, Subpart M), and the printing industry (40 C.F.R. Part 63, Subpart KK).

13. The NESHAPs apply to facilities that are "major sources" and "area sources" of HAPs, 40 C.F.R. § 63.1500(b). Major sources are sources or groups of stationary sources located within a contiguous area and under common control that emit or have the potential to emit ten tons per year or more of any HAP, or twenty-five tons per year or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1); 40 C.F.R. § 63.2. An "area source" is any stationary source of HAPs that is not a major source. 42 U.S.C. § 7412(a)92). A "stationary source" is any building, structure, facility, or installation that emits or may emit any air pollutant. 42 U.S.C. § 7412(a)(3) (by reference to 42 U.S.C. § 7411(a)).

14. Sections 113(a)(3) and (b) of the Act, 42 U.S.C. § 7413(a)(3), (b) prohibit violations of any NESHAP regulation. Thus, a violation of a NESHAP regulation is a violation of the Act.

### NESHAP for Secondary Aluminum Production

15. On March 23, 2000, EPA promulgated the NESHAP for Secondary Aluminum Production, which is set forth at 40 C.F.R. Part 63, Subpart RRR ("Subpart RRR"). 65 Fed. Reg.

3

15,690 (Mar. 23, 2000). Subpart RRR sets forth specific regulations for emission standards and operating requirements; monitoring and compliance requirements; and notifications, reports and recordkeeping requirements.

16. The requirements of Subpart RRR apply to the owner or operator of a "secondary aluminum production facility," 40 C.F.R. § 63.1500(a), which is defined as "any establishment using clean charge, aluminum scrap, or dross from aluminum production, as the raw material and performing one or more of the following processes: scrap shredding, scrap drying/delacquering/decoating, thermal chip drying, furnace operations (i.e., melting, holding, sweating, refining, fluxing or alloying), recovery of aluminum from dross, in-line fluxing, or dross cooling." 40 C.F.R. § 63.1503.

17. Subpart RRR applies to specified affected sources located at a secondary aluminum production facility that is a major source or an area source of HAPs. These affected sources include aluminum scrap shredders, thermal chip dryers, scrap dryers/delaquering kilns/decoating kilns, group 2 furnaces, sweat furnaces, dross-only furnaces, rotary dross coolers, and secondary aluminum processing units, all of which are defined at 40 C.F.R. § 63.1503. 40 C.F.R. § 63.1500(b).

18. The requirements of Subpart RRR pertaining to dioxin and furan emissions and associated operating, monitoring, reporting, and recordkeeping apply to specified affected sources located at a secondary aluminum production facility that is an area source of HAPs. These affected sources include thermal chip dryers, scrap dryers/delacquering kilns/decoating kilns, sweat furnaces and secondary aluminum processing units, as defined at 40 C.F.R. § 63.1503, 40 C.F.R. § 63.1500(c).

19. The owner or operator of an existing affected source was required to comply with

the requirements of Subpart RRR no later than March 24, 2003. 40 C.F.R. § 63.1501(a).

## Illinois Construction Permits and
## Federally Enforceable State Operating Permits (FESOP)

20. Section 110(a)(1) of the Act, 42 U.S.C. § 7410(a)(1), requires each state to adopt and submit to the EPA for approval a State Improvement Plan ("SIP") that provides for the implementation, maintenance, and enforcement of the National Ambient Air Quality Standards ("NAAQS"). Under Section 110(a) of the Act, 42 U.S.C. § 7410(a), each SIP must include a permit program to regulate the modification and construction of any stationary source of air pollution as necessary to assure that NAAQS are achieved. Pursuant to Section 113(a) and (b) of the Act, 42 U.S.C. § 7413(a) and (b), upon EPA approval, SIP requirements are federally enforceable.

21. Under 40 C.F.R. § 52.23, any permit limitation or condition, contained within a permit issued under an EPA-approved program that is incorporated in a SIP, is a requirement of the SIP, and is federally enforceable under Section 113, 42 U.S.C. § 7413.

22. EPA promulgated approval of 35 Illinois Administrative Code (IAC) Part 201, "Permits and General Conditions," as part of the federally enforceable SIP for the State of Illinois on May 31, 1972. *See* 37 Fed. Reg. 10862. Since then, EPA has approved several revisions of 35 IAC Part 201 into the federally enforceable SIP.

23. 35 IAC 201.143 provides that no person shall cause or allow the operation of any new emission source or new air pollution control equipment of a type for which a construction permit is required without first obtaining an operating permit from the Agency.

24. EPA promulgated approval of the Illinois Federally Enforceable State Operating Permit ("FESOP") program on December 17, 1992. *See* 57 Fed. Reg. 59928. Illinois' FESOP program became effective on February 16, 1993. Illinois' operating permit program rules are

codified at 35 Illinois Administrative Code Part 201.

## Enforcement

25. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for a permanent or temporary injunction, and/or for the assessment of a civil penalty up to $25,000 per day for each violation whenever any person violates any requirement of the Act.

26. The Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2641, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701, requires the U.S. EPA to adjust penalties for inflation on a periodic basis. Pursuant to 40 C.F.R. Part 19, the United States may seek civil penalties of up to $124,426 per day for each violation occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025.

## GENERAL ALLEGATIONS

27. At times relevant to this complaint, defendant has owned and operated a secondary aluminum production facility ("the Trialco facility"), which is a "secondary aluminum production facility" as defined in 40 C.F.R. § 63.1503. The Trialco facility is located at 900 East Lincoln Drive, Chicago Heights, Illinois.

28. Defendant is, and at all relevant times has been, the "owner" and "operator" of the Trialco facility within the meaning of Section 112(a)(9) of the Act, 42 U.S.C. § 7412(a)(9), and the federal, state, and local regulations promulgated pursuant to the Act.

29. At times relevant to this complaint, the Trialco facility has processed aluminum scrap and, in some instances, aluminum dross to produce various secondary aluminum products.

30. The Trialco facility is a "stationary source" as defined in Sections 111(a)(3) and 112(a)(3) of the Act, 42 U.S.C. §§ 7411(a)(3) and 7412(a)(3), and the federal, state, and local regulations promulgated pursuant to the Act.

31. At times relevant to this complaint, the Trialco facility has been an "area source" as defined in Section 112(a)(2) of the Act, 42 U.S.C. § 7412(a)(2), and the federal, state, and local regulations promulgated pursuant to the Act.

32. The Trialco facility contains one or more existing emission units or affected sources of hazardous air pollutants, which collectively include but are not limited to, aluminum scrap shredders, thermal chip dryers, scrap dryers, delacquering kilns, group 2 furnaces, rotary dross coolers, and secondary aluminum processing units (which encompass all existing group 1 furnaces and all existing in-line fluxers within a secondary aluminum production facility, each of which individually is an "emission unit," 40 C.F.R. §§ 63.1500(b), 63.1503.).

33. On July 17, 2014, the Illinois Environmental Protection Agency ("Illinois EPA") issued to Trialco a revised construction permit, No. 08110018, for a secondary aluminum production facility ("2014 CP"). Paragraph 2.c. of the 2014 CP requires Trialco to comply with the applicable requirements of the Secondary Aluminum Production NESHAP.

34. Illinois EPA issued a FESOP Permit, No. 12040047 to Trialco on April 18, 2018 ("the 2018 FESOP"). The 2018 FESOP specifies the requirements of Subpart RRR that apply to Trialco.

35. On January 4, 2021, EPA issued a Notice and Finding of Violation ("NOV/FOV") related to Subpart RRR requirements for the Trialco facility.

36. On March 27, 2023, EPA issued a second NOV/FOV related to Subpart RRR requirements for the Trialco facility.

## CLAIMS FOR RELIEF

### Count One
### Violations Identified in the January 4, 2021 NOV/FOV

37. The United States incorporates the allegations in Paragraphs 1 through 36 as though

7

fully set forth herein.

38. EPA conducted an unannounced Clean Air Act inspection of the Trialco facility on March 7, 2019.

39. Following the inspection, on January 30, 2020, EPA sent defendant an information request pursuant to Section 114 of the Clean Air Act.

40. Defendant completed its response to the information request on July 10, 2020.

41. After Trialco's initial response to the request for information, Trialco submitted updated information and/or clarifications to its response in emails dated September 10, September 21, October 7, October 8, October 14, October 16, October 19, October 20, October 21, October 22, October 23, October 30, November 10, November 11, November 12, November 13, November 23, November 24, and December 22, 2020.

42. Following the March 2019 inspection and a review of the information that Trialco provided in response to EPA's information request, EPA identified the following violations that were present at the Trialco facility.

   a. Trialco failed to operate its ETA fabric filter at all times when the Main Furnace (MF) was operating, and failed to operate its Wheelabrator fabric filter at all times when the Small Furnace (SF) was operating, in violation of good air pollution control practices, thereby constituting violations of 40 C.F.R. § 63.1506(a)(5) of the Secondary Aluminum Production NESHAP, Paragraph 6.b of the 2014 CP and Paragraphs 9.a.iii and 11.b of the 2018 FESOP.

   b. Trialco failed to perform monthly inspections of the labels of its group 1 furnaces and keep records of such inspections in violation of 40 C.F.R. §§ 63.1510(c) and 63.1517(b)(13) of the Secondary Aluminum Production NESHAP, Paragraphs 2.c of its 2014 Construction Permit (CP) and Paragraphs 16.c and 18.b.ix of the 2018 FESOP.

   c. Trialco failed to conduct annual inspections of each capture/collection and closed vent system and to maintain records of these inspections, constituting violations of 40 C.F.R. §§ 63.1510(d)(2) and 63.1517(b)(14) of the Secondary Aluminum

        Production NESHAP; Paragraph 2.c of the 2014 CP, and Paragraphs 16.d.ii and 18.b.x of the 2018 FESOP.

d. Trialco failed to maintain records of the number of total operating hours for various affected sources or emission units during each 6-month reporting period, records of each bag leak detection alarm, the time of the alarm, the time corrective action was initiated and completed, and a brief description of the cause of the alarm and the corrective action(s) taken, constituting a violation of 40 C.F.R. § 63.1517(b)(1)(i), Paragraph 2.c of the 2014 CP, and Paragraph 18.b.i.A of the 2018 FESOP.

e. Trialco failed, on at least the dates and times noted in Appendices C-1 and C-2 of EPA's January 4, 2021 NOV/FOV, to maintain the lime feeder setting at or above the level established during requisite performance testing, in violation of 40 C.F.R. §§ 63.1506(m)(4) and 63.1510(i)(4) of the NESHAP, Paragraph 2.c of the 2014 CP, and Paragraphs 9.e.iv, 12.a.iii and 16.h.iv of the 2018 FESOP.

f. Trialco failed to submit an application for approval for its alternative monitoring procedure regarding its use of ammonia in its fabric filters, constituting a violation of 40 C.F.R. § 63.1510(w) of the Secondary Aluminum Production NESHAP.

g. Trialco failed to maintain the gaseous chlorine flux rate in lb/hr at or below 761 lb/hr for at least the days and times specified in Appendix D of EPA's January 4, 2021 NOV/FOV, constituting violations of Paragraph 12.a of the 2018 FESOP.

h. Trialco failed to test its furnace emissions under representative conditions expected to produce the highest level of HAP emissions, constituting a violation of 40 C.F.R. § 63.1511(b)(1) of the Secondary Aluminum Production NESHAP, Paragraph 2.c of the 2014 CP, and Paragraph 13.b.i of the 2018 FESOP.

i. Trialco failed to include required items in its OM&M plan, specifically: the process and control device parameters to be monitored to determine compliance along with established operating levels or ranges; a monitoring schedule for each affected source and emission unit; procedures for the proper operation and maintenance of each process unit and add-on control device used to meet the applicable limits or standards in 40 C.F.R § 63.1505; procedures for monitoring process and control device parameters, including lime injection rates; the procedure to be used for determining charge/feed (or throughput) weight if a measurement device is not used; corrective actions to be taken when process or operating parameters or add-on control device parameters deviate from the established

        values or ranges, including procedures to determine and record the cause of any deviation or excursion and the time the deviation or excursion began and ended and procedures for recording the corrective action taken, the time corrective action was initiated, and the time/date corrective action was completed; and a maintenance schedule for each process and control device that is consistent with the manufacturer's instructions and recommendations for routine and long-term maintenance; constituting violations of 40 C.F.R. § 63.1510(b) of the Secondary Aluminum Production NESHAP, Paragraph 2.c of the 2014 CP, and Paragraph 16.b of the 2018 FESOP.

j.    Trialco failed to take corrective actions to return its process and control device parameter levels to the values established during the requisite performance test(s) and to take steps to prevent recurrences of the causes of the deviations, constituting violations of 40 C.F.R. § 63.1506(p) of the NESHAP, Paragraph 2.c of the 2014 CP and Paragraph 9.f of the 2018 FESOP.

k.    Trialco failed to maintain operating logs for each of its furnaces documenting conformance with operating standards for maintaining the level of molten metal above the top of the passage between the sidewell and hearth during reactive flux injection, constituting violations of 40 C.F.R. § 63.1517(b)(10) of the Secondary Aluminum Production NESHAP, Paragraph 2.c of the 2014 CP, and Paragraph 18.b.viii of the 2018 FESOP.

l.    Trialco failed to report excursions of process or operating parameter values or ranges, in violation of 40 C.F.R. § 63.1516(b) of the Secondary Aluminum Production NESHAP, Paragraph 2.c of the 2014 CP, and Paragraph 20.b of the 2018 FESOP.

43.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and under the Federal Civil Penalties Inflation Adjustment Act of 1990 and EPA's implementing regulations, the violations set forth above are subject to injunctive relief and civil penalties up to $124,426 per day for each violation.

## Count Two
### Emission Exceedances Identified in the March 27, 2023 NOV/FOV

44.    The United States incorporates the allegations in Paragraphs 1 through 43 as though fully set forth herein.

45. Trialco's 2014 Illinois EPA construction permit, No. 08110018, condition 7.a.ii, and Trialco's 2018 Illinois EPA FESOP permit, No. 12040047, condition 12.a.ii.C, establish the following emission limits applicable to the small furnace at the Trialco facility:

    a.    Particulate matter (PM)    0.0013 lb per ton of scrap

    b.    Hydrogen chloride (HCl)    0.0038 lb per ton of scrap

46. Between October 17, 2022 and October 22, 2022, Trialco performed an emission test of the small furnace and associated Wheelabrator baghouse (October 2022 stack test). Trialco submitted the results of this emission test to EPA on January 5, 2023.

47. The October 2022 stack test showed Trialco's small furnace emitted regulated pollutants in the following amounts:

    a.    Particulate matter (PM)    0.0389 lb per ton of scrap

    b.    Hydrogen chloride (HCl)    0.0048 lb per ton of srap

48. As set forth above, Trialco's small furnace failed to meet the PM and HCl emission limits of the 2014 construction permit and the 2018 FESOP.

49. As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and under the Federal Civil Penalties Inflation Adjustment Act of 1990 and EPA's implementing regulations, the violations set forth above are subject to injunctive relief and civil penalties up to $124,426 per day for each violation.

**Count Three**
**Baghouse Inlet Temperature Violations**
**Identified in the March 27, 2023 NOV/FOV**

50. The United States incorporates the allegations in Paragraphs 1 through 49 as though fully set forth herein.

51. Pursuant to 40 C.F.R. § 63.1515(b)(4) of Subpart RRR and condition 21.a of the

2018 FESOP, Trialco submitted to EPA a notice of compliance status report on February 3, 2023 (February 2023 NOCSR) based on the results of the October 2022 stack test.

52. Trialco's October 2022 stack test established a maximum 3-hour average baghouse inlet temperature of 101.9° F for the ETA (main furnace) baghouse and 120.5° F for the Wheelabrator (small furnace) baghouse.

53. In the February 2023 NOCSR, Trialco stated that it could not "accept the abnormally low and non-representative baghouse inlet temperature from the October 2022 test event . . . without incurring long periods of non-compliance during the warmer late spring, summer, and early fall months (i.e., when the baghouse inlet temperatures are expected to be at the high end of the typical operating range)." Thus, Trialco stated its intention to continue to implement the existing baghouse inlet temperature limit established during Trialco's previous June 2010 performance test of the main furnace, and to apply that limit to both the main furnace and small furnace going forward.

54. Trialco made substantial changes to the main furnace and small furnace capture and collection systems in the years between June 2010 and the submission of the February 2023 NOCSR, including but not limited to adding new steel plating to reduce the open area for the charge well hood of the main furnace and adding new steel plating to reduce the open area at the sides of the small furnace's charge well hood.

55. These changes negated the ability of Trialco to rely on the June 2010 stack test to demonstrate compliance in the February 2023 NOCSR.

56. By failing to properly establish a maximum operating parameter value for the baghouse inlet temperature for the main furnace that ensures compliance with applicable emission limits, Trialco is in violation of 40 C.F.R. § 63.1511(g) of Subpart RRR, Condition 2.c of the 2014

12

construction permit, and Condition 13.d of the 2018 FESOP.

57. By failing to properly establish a maximum operating parameter value for the baghouse inlet temperature for the small furnace that ensures compliance with applicable emission limits, Trialco is in violation of 40 C.F.R. § 63.1511(g) of Subpart RRR, Condition 2.c of the 2014 construction permit, and Condition 13.d of the 2018 FESOP.

58. As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and under the Federal Civil Penalties Inflation Adjustment Act of 1990 and EPA's implementing regulations, the violations set forth above are subject to injunctive relief and civil penalties up to $124,426 per day for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America respectfully requests that this court:

1. Enjoin defendant from further violations of the CAA and order defendant to take all steps necessary to comply with the CAA at the Trialco facility;

2. Assess civil penalties against defendant of up to $124,426 per day for each violation;

3. Award the United States all costs and disbursements of this action; and,

4. Grant such other relief as the court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

ADAM GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

ANDREW BOUTROS
United States Attorney

June 30, 2025
Date

By: *Nigel R. Cooney*
NIGEL B. COONEY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1996
nigel.cooney@usdoj.gov

FOR THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY:

ROBERT KAPLAN
Regional Counsel
U.S. Environmental Protection Agency, Region 5

SOPHIE GRUETERICH
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 5
Office of Regional Counsel